No. 18-50730

# United States Court of Appeals
## for the
## Fifth Circuit

WHOLE WOMAN'S HEALTH; BROOKSIDE WOMEN'S MEDICAL CENTER, P.A.,
doing business as Brookside Women's Health Center and Austin Women's Health Center;
LENDOL L. DAVIS, M.D.; ALAMO CITY SURGERY CENTER, P.L.L.C., doing
business as Alamo Women's Reproductive Services; WHOLE WOMAN'S
HEALTH ALLIANCE; DR. BHAVIK KUMAR,

*Plaintiffs-Appellees,*

– v. –

CHARLES SMITH, Executive Commissioner of the Texas Health
and Human Services Commission, in his official capacity,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS (AUSTIN)
NO. 1:16-CV-1300

## BRIEF FOR *AMICUS CURIAE* BIOMEDICAL ETHICISTS
## IN SUPPORT OF PLAINTIFFS-APPELLEES

KENDALL COLLINS
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300

STUART M. SARNOFF
NATE ASHER
MARJORIE B. TRUWIT
SAMANTHA EMILY MILLER
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Amicus Curiae Biomedical Ethicists*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that–in addition to the persons and entities listed in the appellees Certificate of Interested Persons–the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### *Plaintiffs-Appellees*
Whole Woman's Health
Whole Woman's Health Alliance
Brookside Women's Medical Services PA, d/b/a Brookside Women's Health Center and Austin Women's Health Center
Alamo City Surgery Center PLLC, d/b/a Alamo Women's Reproductive Services
Dr. Lendol L. Davis
Dr. Bhavik Kumar

### *Attorneys for Plaintiffs-Appellees*
David Brown
Juanluis Rodriguez
Dipti Singh
Stephanie Toti
Lawyering Project - A Project of the Tides
Molly Duane
Autumn Katz
Emily Nestler
Caroline Sacerdote
Center for Reproductive Rights

### *Attorneys for Plaintiffs-Appellees, cont'd*
J. Alexander Lawrence
Francesca Cocuzza
Morrison & Foerster LLP
Patrick J. O'Connell
Law Offices of Patrick J. O'Connell PLLC
Hon. Jan Soifer*
formerly of O'Connell & Soifer LLP

***Defendants-Appellants***
Charles Smith, Executive Commissioner of the Texas Health and Human Services
Commission

***Attorneys for Defendants-Appellants***
Adam A. Biggs
Nicole Bunker-Henderson
James E. Davis
Todd Lawrence Disher
Kyle D. Hawkins
Kara Holsinger
Scott. A Keller
Beth Klusmann

***Attorneys for Defendants-Appellants***
John S. Langley*
Jeffrey C. Mateer
Darren McCarthy*
Austin R. Nimocks
Ken Paxton
Benjamin S. Walton
Craig S. Warner*
Office of the Attorney General

***Amici Curiae***
Biomedical Ethicists
Dr. Lisa Anderson-Shaw, Dr.P.H., M.A., M.S.N., A.N.P.-B.C.
Professor Leo Beletsky, J.D., M.P.H.
Dr. Amy E. Caruso Brown, M.D., M.Sc., M.S.C.S.
Dr. Mara Buchbinder, Ph.D.
Dr. Alyssa M. Burgart, M.D., M.A., F.A.A.P.
Dr. Arthur Caplan
Professor Brietta Clark
Professor Carl H. Coleman
Professor Mary Coombs
Dr. Colleen Denny, M.D.
Dr. Ezekiel J. Emanuel, M.D., Ph.D.
Dr. Eric A. Feldman, J.D., Ph.D.
Professor Robert I. Field
Professor Moti Gorin
Dr. Scott D. Halpern, M.D., Ph.D.
Professor Laura Hermer, J.D. L.L.M.

Professor Sharona Hoffman, J.D., L.L.M., S.J.D.
Professor Peter D. Jacobson, J.D., M.P.H.
Dr. Steven Joffe, M.D., M.P.H.
Professor Nancy E. Kass, Sc.D.
Lisa Kearns, M.S., M.A.
Dr. Emily A. Largent, J.D., Ph.D., R.N.
Dr. David Magnus, Ph.D.
Dr. Mary Faith Marshall, Ph.D.
Dr. Karen J. Maschke, Ph.D.
Professor Thomas Wm. Mayo
Dr. Maria W. Merritt, Ph.D.
Dr. Steven H. Miles M.D.
Professor Michelle Oberman
Dr. David Orentlicher, M.D., J.D.
Dr. Govind Persad, J.D., Ph.D.
Dr. Reed E. Pyeritz, M.D., Ph.D.
Professor Jessica L. Roberts
Dr. Lainie Friedman Ross, M.D., Ph.D.
Dr. William M. Sage, M.D., J.D.
Dr. Bethany Spielman, Ph.D., J.D.
Dr. Jeffrey P. Spike, Ph.D.
Dr. Ronit Y. Stahl, Ph.D., M.A.
Professor Lance Tibbles
Dr. Tom Tomlinson, Ph.D.
Dr. Robert D. Truog, M.D., M.A.
Professor Ellen Waldman, J.D., L.L.M.

### ***Attorneys for Amici Curiae***
Stuart Sarnoff
Nate Asher
Samantha E. Miller
Marjorie B. Truwit
Kendall N. Collins
O'Melveny & Myers LLP

\* Indicates counsel has withdrawn

Respectfully submitted,

O'MELVENY & MYERS LLP

/s/ Stuart Sarnoff
Stuart Sarnoff
Nate Asher
Samantha E. Miller
Marjorie B. Truwit
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Kendall Collins
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Counsel for Amici Curiae Biomedical Ethicist*

# TABLE OF CONTENTS

**Page**

I.      INTEREST OF *AMICI CURIAE*.......................................................... 1

II.     SUMMARY OF ARGUMENT.......................................................... 2

III.    ARGUMENT ................................................................................ 5

        A.    The Challenged Laws Are Inconsistent with Principles of
              Biomedical Ethics. ................................................................ 5

              1.    The Challenged Laws Intrude on the Patient-Physician
                    Relationship. ................................................................ 5

              2.    The Challenged Laws Undermine Patients' Dignity ................. 10

              3.    The Challenged Laws Violate the Principle of Non-
                    Maleficence by Forcing Physicians To Expose Patients to
                    Unnecessary Risk of Harm ........................................ 13

              4.    The Challenged Laws Unjustly Threaten to Impose on
                    Patients Unnecessary and Undue Burdens. ................ 16

IV.     CONCLUSION ............................................................................ 19

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes**

25 Tex. Admin Code §§ 1.131-1.137 ................................................................ 3

25 Tex. Admin. Code § 1.132(33) ................................................................... 3

25 Tex. Admin. Code § 1.132(42) ................................................................... 3

25 Tex. Admin. Code § 1.132(46) ................................................................... 3

25 Tex. Admin. Code § 1.136(4) ..................................................................... 3

25 Tex. Admin. Code § 138.5(c) ..................................................................... 3

Tex. Health & Safety Code § 697.001 ............................................................. 2

Tex. Health & Safety Code § 697.004(b) ........................................................ 3

**Other Authorities**

*ACOG Committee Opinion No. 439: Informed Consent* at 2–3 (Aug.
    2009, reaffirmed 2015) ........................................................................... 6, 7

Alison Norris, Danielle Bessette, Julia R. Steinberg, Julia R. Kavanaugh,
    Megan L. De Zordo Silvia, Davida Becker, *Abortion Stigma: A
    Reconceptualization of Constituents, Causes, and Consequences*,
    Women's Health Issues, 21(3): s49-s54 (2011) ..................................... 15

AMA, Code of Medical Ethics, *AMA Principles of Medical Ethics*,
    https://www.ama-assn.org/sites/default/files/media-
    browser/principles-of-medical-ethics.pdf ........................................... 7, 14

Amy Mullin, *Early Pregnancy Losses: Multiple Meanings and Moral
    Considerations*, 46 J. OF SOC. PHIL. 1 (2015) ...................................... 12

*Code of Medical Ethics Opinion 1.1.2: Prospective Patients*, Am. Med.
    Ass'n ...................................................................................................... 10, 16

Franciso Perales & Abram Todd, Structural Stigma and the Health and
    Wellbeing of Australian LGB Populations: Exploiting Geographic
    Variation in the Results of the 2017 Same-Sex Marriage Plebiscite,
    208 Soc. Sci. & Med. 190 (2018) .............................................................. 16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Glyn Elwyn et al*., Shared Decision Making:  A Model for Clinical Practice*, 27 J. Gen. Internal Med.1361 (2012)......................................................... 8

Glyn Elwyn, Steve Laitner, Angela Coulter, Emma Walker, Paul Watson, & Richard Tomson, *Implementing Shared Decision Making in the NHS*, THE BMJ, Vol. 341 (2010)............................................................ 8

Jenny Way & J. Randall Curtis, *Withdrawing Life Support and Resolution of Conflict with Families*, The BMJ, Vol. 325 ................................... 11

Jonah Bardos, Daniel Hercz, Jenna Friedenthal, Stacey A. Missmer & Zev Williams, *A National Survey on Public Perceptions of Miscarriage*, 125 (6) Obstetrics and Gynecology, 1313–1320............................ 15

Kari White, Victoria deMartelly, Daniel Grossman & Janet Turan, *Experiences Accessing Abortion Care in Alabama Among Women Traveling for Services*, 26(3) Women's Health Issues 298 (2016)....................... 14

L. Snyder, American College of Physicians Ethical Manual, 156 (Pt. 2) Ann. Intern. Med. 73 (6th ed. 2012).............................................................. 13, 14

Lois Snyder for the Am. Coll. of Physicians Ethics, Professionalism, & Human Rights Comm., *American College of Physicians Ethics Manual:  Sixth Edition,* 156 Annals Internal Med. 73, 74 (2012), http://annals.org/aim/fullarticle/1033289/american-college-physican-ethics-manual-sixth -edition ............................................................................. 7, 8

Mark L. Hatzenbuehler, Jo C. Phelan, & Bruce G. Link, *Stigma as a Fundamental Cause of Population Health Inequalities*, 103(5) Am. J. of Pub. Health 813 (2013) ................................................................................. 15

*Organ Donation Statistics*, U.S. Dep't of Health & Human Servs., https://www.organdonor.gov/statistics-stories/statistics.html.............................. 11

Ruth Macklin, *Ethics and Reproductive Health:  A Principled Approach*, World Health Statistic Quarterly 151–52 (1996), *available at* http://apps.who.int/iris/bitstream/10665/54277/1/whsq_49_1996_p148 -153_eng.pdf................................................................................................... 16, 17

TM Wilkinson, *Individual and Family Consent to Organ and Tissue Donation: Is the Current Position Coherent?*, 31 J. of Med. Ethics (2005)................................................................................................................... 11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Tom L. Beauchamp & James F. Childress, *Principles of Biomedical
  Ethics* 13–25 (2012)..........................................................................*passim*

## I.    INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are a preeminent group of physicians and professors across a variety of disciplines, including law, medicine, and public health, from nationally and internationally recognized universities and institutions whose scholarship includes the field of biomedical ethics.  Collectively, *amici* hold a multitude of degrees, including JDs, MDs, PhDs, and MPHs, and have wide experience in this field.  *Amici* have researched, published, and taught courses on the intersection of biomedical ethics and women's health, human rights, technology, and the law.  Several *amici* serve on national biomedical ethics committees and lead centers and institutes devoted to the field of biomedical ethics.  All *amici* have made significant contributions to the scholarship and practice of biomedical ethics.

This case is a constitutional challenge to a Texas statute and associated regulations that require health care facilities to dispose of embryonic and fetal tissue resulting from abortion, miscarriage, and ectopic pregnancy surgery via interment or cremation, regardless of their patients' individual beliefs and preferences.  The statute and regulations prohibit health care facilities from disposing of their patients' embryonic and fetal tissue through any other means, including common medical

---

[1] This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties.  Undersigned counsel for *amici curiae* certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than *amici* and their counsel have contributed money for this brief.

methods of disposal. *Amici* are well suited to opine on whether these statutes are consistent with biomedical ethics. They also have a strong interest is ensuring that the Court's decision accurately describes the principles of biomedical ethics implicated by the statute and regulations at issue and how they should be applied.

## II.    SUMMARY OF ARGUMENT

The provisions of Chapter 697 of the Texas Health and Safety Code and the implementing regulations promulgated thereunder (collectively, the "Challenged Laws") prevent physicians from upholding their ethical obligations. The district court observed that not all women want their fetal tissue to be cremated or buried and that the Challenged Laws would infringe on some patients' personal beliefs. R.3292-93, 3316. Appellant contends that Chapter 697—passed in 2017—was enacted with the goal of "express[ing] the state's profound respect for the life of the unborn by providing for a dignified disposition of embryonic and fetal tissue remains." Appellant's Br. at 5; Tex. Health & Safety Code § 697.001. But as shown below, the Challenged Laws require physicians to violate their ethical obligations to their patients by inflicting needless harm, including precluding women from exercising free choice about their essential healthcare and subjecting them to harmful stigma.

The Challenged Laws prescribe unduly restrictive methods of treatment and disposition of embryonic and fetal tissue remains ("EFTR") after certain abortions, miscarriages, and surgeries. Previously, all EFTR was regulated as "special waste from health care-related facilities," a category of bio-hazardous material that includes

"human materials removed during surgery, labor and delivery, autopsy, embalming, or biopsy." 25 Tex. Admin. Code § 1.132(42), (46). EFTR was subject to statutory Special Waste Rules, which did not differentiate between EFTR and other tissue removed from human bodies during medical care. 25 Tex. Admin Code §§ 1.131-1.137. The Special Waste Rules permitted several methods of treatment and disposal, which allowed both EFTR and other human tissue to be treated and disposed of in accordance with standard practices for human tissue or via interment or cremation. 25 Tex. Admin. Code §§ 1.136(4), 1.132(33). Conversely, the Challenged Laws improperly limit the disposition of EFTR, requiring it to be treated and disposed of differently from all other special waste from healthcare facilities, and only in a manner "authorized by law for human remains." Tex. Health & Safety Code § 697.004(b); 25 Tex. Admin. Code § 138.5(c). The Challenged Laws do not add any alternatives for treatment or disposition of EFTR that were previously unavailable under the Special Waste Rules; instead, they eliminate options. Despite the State's assertion to the contrary, the Challenged Laws cannot be ethically justified.

*Amici* respectfully request that this Court affirm the district court's decision to enjoin the Challenged Laws because their requirements would force physicians to take actions that are entirely inconsistent with their ethical obligations:

*First*, the Challenged Laws contravene several key pillars of biomedical ethics. By forcing physicians to dispose of EFTR through very limited means, the

Challenged Laws prevent physicians and patients from making individualized decisions. Specifically, the Challenged Laws inhibit patients from exercising their own personal choices as to how EFTR should be disposed, forcing physicians to act without regard for their patients' wishes, abrogating the physicians' ethical obligations to their patients and undermining the relationship of trust between physicians and their patients.

*Second*, while Appellant claims that the Challenged Laws provide dignified disposal of EFTR, the Laws improperly impose a monolithic view of dignity upon a diverse array of Texas patients. In doing so, the Challenged Laws prevent physicians from providing care tailored to patients with divergent cultural viewpoints and beliefs regarding dignity, in direct violation of a physician's obligation to treat all patients in accordance with their wishes.

*Third*, the Challenged Laws violate the ethical canon of non-maleficence: the obligation of a physician to "do no harm." The Challenged Laws impose a limited and narrow set of EFTR disposal methods, irrespective of the patient's wishes. As the district court concluded, the Challenged Laws thus have the potential to increase the stigma associated with terminating a pregnancy and the distress that can be associated with miscarriage or ectopic pregnancy. As a result, the Challenged Laws may subject patients to increased harm without any countervailing benefit, violating the principle of non-maleficence.

4

*Fourth*, it is an important bioethical principle to enhance, rather than reduce, all patients' equal access to care, regardless of their socioeconomic status, ability to pay, or geographic location. As the district court concluded, there are few capable and reliable options in Texas to dispose of EFTR in compliance with the Challenged Laws. Implementation of the Challenged Laws would "likely cause the shutdown of women's healthcare providers" unable to comply with the Challenged Laws, preventing physicians from providing care sought by their patients. R.3317. These burdens are likely to be felt most by patients in rural and remote areas, with fewer healthcare options. The Challenged Laws therefore impose significant burdens on patients' abilities to seek appropriate medical care, particularly impacting low-income and rural patients and undercutting a physician's obligation to promote just and equal access to medical care.

## III. ARGUMENT

### A. The Challenged Laws Are Inconsistent with Principles of Biomedical Ethics.

#### 1. The Challenged Laws Intrude on the Patient-Physician Relationship.

The underpinnings of biomedical ethics reflect four key principles—respect for autonomy, beneficence, non-maleficence, and justice. *See, e.g.*, Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* 13–25 (2012) (hereinafter *Principles of Biomedical Ethics*). These principles must be accorded equal weight ex ante by bioethicists and physicians making determinations related to

5

patient care. *Id.* at 101. All of these principles underlie the contours of the inviolable relationship between physician and patient.[2]

Fundamental to this relationship is the patient's right to make autonomous decisions about her own medical care through the practice of informed consent. The physician is tasked with providing a patient with information, guidance, and advice, but ultimately is ethically bound to operate within the framework of informed consent—empowering the patient to make informed and voluntary decisions about her care that best realize the balance of her choices. *See* Comm. on Ethics, Am. Coll. of Obstetricians & Gynecologists ("ACOG"), *ACOG Committee Opinion No. 439: Informed Consent* at 2–3 (Aug. 2009, reaffirmed 2015) ("ACOG Opinion 439"). Patient autonomy is rooted in self-determination: "the [patient's] taking hold of her own life and action, determining the meaning and the possibility of what she undergoes as well as what she does." *Id.* at 2–3. Elements of informed consent include voluntariness—or the absence of coercion, comprehension, and autonomous authorization—so that it includes both "freedom from external coercion, manipulation, or infringement of bodily integrity," and "freedom from being acted on

---

[2] Dr. Thomas Cunningham correctly testified that Beauchamp & Childress's *Principles of Biomedical Ethics* and the four bioethical principles for clinical practice set forth are customary in the field. ROA.4419. It is not customary or even apposite to apply in clinical medical practice the 1979 guidelines for human subject research. ROA.4429

by others when they have not taken account of and respected the individual's own preference and choice." *Id.* at 5.

Once a patient's decision has been made, under the duty to respect patient autonomy, the physician is required to "protect and foster [the] patient's free, uncoerced choices." Lois Snyder for the Am. Coll. of Physicians Ethics, Professionalism, & Human Rights Comm., *American College of Physicians Ethics Manual: Sixth Edition,* 156 Annals Internal Med. 73, 74 (2012) ("ACP Ethics Manual"), http://annals.org/aim/fullarticle/1033289/american-college-physican-ethics-manual-sixth -edition. While patients and physicians may choose to discuss the patient's reasons for making a particular medical decision, the principles of medical ethics dictate that the physician treat the patient's ultimate choice as "paramount." ACOG Opinion 439 at 2; AMA, Code of Medical Ethics, *AMA Principles of Medical Ethics* at VIII ("AMA Code"), https://www.ama-assn.org/sites/default/files/media-browser/principles-of-medical-ethics.pdf.

The informed consent framework can only be achieved where there is a relationship of trust between a clinician and patient. *See* AMA Code at Chapter 1: Opinions on Patient Rights ("The relationship between a patient and physician is based on trust, which gives rise to physicians' ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others, to use sound medical judgments on patients' behalf, and to advocate for their patients' welfare."). Indeed, the modern notion of informed consent is best understood as a process of

"shared decision making" between the physician and the patient. "Shared decision making" is a prominent model for ethically obtaining informed consent and "has been defined as: 'an approach where clinicians and patients share the best available evidence when faced with the task of making decisions, and where patients are supported to consider options, to achieve informed preferences.'" Glyn Elwyn et al., *Shared Decision Making:  A Model for Clinical Practice*, 27 J. Gen. Internal Med.1361, 1361 (2012) (quoting Glyn Elwyn, Steve Laitner, Angela Coulter, Emma Walker, Paul Watson, & Richard Tomson, *Implementing Shared Decision Making in the NHS*, The BMJ, Vol. 341, at 971 (2010)). Shared decision making "rests on accepting that individual self-determination is a desirable goal and that clinicians need to support patients to achieve this goal, wherever feasible*." Id.*  Shared decision making (i) stresses the physician's role in informing the patient and supporting the patient in deliberating and determining her own preferences; and (ii) recognizes that decisions made in the healthcare context are colored by "psychological, social and emotional factors" as well as by culture and tradition. *Id.* at 1363.  Under this approach to informed consent, physicians are neither paternalistic actors intent to impose their will on patients, nor mere vehicles for the delivery of objective information, but instead facilitators of productive deliberation focused on conferring agency. *Id.*  Ultimately, "[t]he physician's professional role [is] … to  make recommendations on the basis of the best available medical evidence and to pursue options that comport with the patient's unique health needs, values,

and preferences." ACP Ethics Manual at 86. Requiring physicians to impose the

State's values on the patient—as the Challenged Laws do here—prevents physicians

from performing this key role.

The Challenged Laws also undermine the fundamental relationship of trust

between patient and physician by forcing the physician to act without regard for a

patient's wishes, all in the context of medical care that can be fraught with extremely

personal and emotional consequences for the patient. More specifically, the

Challenged Laws vastly limit the disposition options available to women who hold a

wide range of beliefs as to how EFTR should be disposed—a deeply personal

intrusion. Furthermore, the Challenged Laws, which make physicians responsible

for the disposal of EFTR under specific guidelines, force physicians to perform an

act that inherently conveys a specific political and philosophical message to patients

who may not share those specific political and philosophical beliefs. Women making

private and deeply personal healthcare decisions are thus deprived of the support of

an independent clinician whom they can trust to guide and support them through the

healthcare decision making process. Instead, those women have access only to

physicians who are obliged to impose the state's singular view on disposal of EFTR,

which in many cases will be in conflict with the views held by their patients

regarding the end of pregnancy and EFTR disposition methods. In short, the

Challenged Laws contravene the inviolable physician-patient relationship by

imposing the views of the state regarding the philosophical, religious, and moral

consequences of abortion and miscarriage on women, *through their physician*.

## 2.    The Challenged Laws Undermine Patients' Dignity.

The basic principles of biomedical ethics support the essential belief in the

fundamental importance of human dignity.  Appellant asserts that the Challenged

Laws provide dignified disposal of EFTR, but this assumes universal agreement that

embryonic and fetal tissue are deserving of the dignity accorded to humans, and a

universal view about what is and is not a dignified way in which to dispose of EFTR.

Neither assumption is correct.

Medical practitioners have a duty to treat patients of all races, religions, and

cultures without discrimination.  *See Code of Medical Ethics Opinion 1.1.2:*

*Prospective Patients*, Am. Med. Ass'n.  As such, physicians are tasked with

providing care to individuals from a broad array of backgrounds, with varying

spiritual and philosophical beliefs.  Decisions related to dignity must therefore be

based on the individual patient's preferences, recognizing the inherently cultural,

religious, and personal values underlying conceptions of dignity.

Differing conceptions of dignity often underlie the most difficult bioethical

decisions.  For instance, the decision about whether to continue to supply life

sustaining measures to a patient in a permanent vegetative state involves questions of

morality as well as religious and spiritual conceptions of what constitutes life and

death.  Under such circumstances involving a human being, it is considered best

10

practice to discontinue life support only after receiving informed consent following "culturally sensitive communication with family members" and "time spent discussing, understanding, and accommodating cultural and religious perspectives." *See* Jenny Way & J. Randall Curtis, *Withdrawing Life Support and Resolution of Conflict with Families*, The BMJ, Vol. 325, at 1342-45.

Organ transplants from deceased donors are similarly fraught with considerations of dignity and morality. A dramatic shortage of organs[3] justifies public policy encouraging organ donation, but the ultimate decision to become a donor is considered uniquely personal. This is due to concerns that center around dignity—treatment of the body after death, the connection between the body and the spirit, and respect for religious preferences and beliefs. Although many believe that organ donation is a moral imperative, societies around the world, including in this country, require donor or family consent to respect individual conceptions of dignity and autonomy. Ethicists and policy makers widely agree that patient and family autonomy regarding the decision to donate a deceased's organs must be respected. *See* TM Wilkinson, *Individual and Family Consent to Organ and Tissue Donation: Is the Current Position Coherent?*, 31 J. of Med. Ethics, at 10 (2005).

---

[3] In the United States alone, twenty people die each day waiting for a transplant. *See Organ Donation Statistics*, U.S. Dep't of Health & Human Servs., https://www.organdonor.gov/statistics-stories/statistics.html.

As the above examples demonstrate, autonomy and consent are vital to resolving difficult questions of biomedical ethics, particularly when such decisions implicate conceptions of human dignity, which are informed by each individual's culture, experience, religion, and philosophy.  This is particularly true in the context of decisions related to reproductive health.  The significance of pregnancy loss or termination is deeply personal and can have significant implications for a patient.  ROA 2491-92.  The significance women attach to a fetus after pregnancy loss or abortion varies greatly across cultures and situations.  Most abortions and miscarriages occur at the embryonic stage, when the embryo cannot be identified by the naked eye, ROA 4111, 4132-33, 4376, 4870, 5510, and the timing, circumstances and reasons for the end of pregnancy, as well as the woman's values and beliefs, can affect the patient's preferences.  *See generally* Amy Mullin, *Early Pregnancy Losses: Multiple Meanings and Moral Considerations*, 46 J. OF SOC. PHIL. 1, 28 (2015).  Some women do not believe that an embryo or fetus is a life and therefore do not attach any moral significance to the end of pregnancy.  Others, including some women who choose to terminate a pregnancy, believe that it represents the loss of a child, and engage in diverse efforts to acknowledge their loss.  *See id.*

As such, value determinations as to which methods of EFTR disposal align with conceptions of human dignity are deeply personal and cannot ethically be imposed on women by their physicians or the state.  Protecting a patient's dignity in the context of EFTR disposal is essential because decisions regarding reproductive

health are often complicated by loss of agency and control over issues inherent to body and identity. *See id.* One study of women who experienced pregnancy loss found that "feelings of helplessness were common." *Id.* at 39. This sense of helplessness is exacerbated when women are denied agency to choose the method of EFTR disposal which aligns with her own beliefs. Such a phenomenon is already apparent at certain hospitals in Texas requiring interment of EFTR, including Seton Hospital, where a patient subjected to this policy explained at trial how she felt shamed and stigmatized for exercising her own personal beliefs. R.3244. Given the substantial implications for a woman's emotional health that already underlie many circumstances of pregnancy loss, the Challenged Laws degrade patient autonomy by depriving patients of agency and imposing a singular value judgment upon all patients, irrespective of the patient's views, and are fundamentally at odds with the principle of human dignity and biomedical ethics.

### 3. The Challenged Laws Violate the Principle of Non-Maleficence by Forcing Physicians To Expose Patients to Unnecessary Risk of Harm.

Another ethical cannon critical to the physician-patient relationship is the principle of non-maleficence: the obligation to "do no harm." This requires a physician to inflict the least harm possible to reach a beneficial outcome. *See Principles of Biomedical Ethics* 150-54; L. Snyder, American College of Physicians Ethical Manual, 156 (Pt. 2) Ann. Intern. Med. 73, 74-75 (6th ed. 2012). The complementary principle of beneficence could be said to demand even more than

13

non-maleficence because it requires that healthcare professionals "take positive steps

to help others, not merely refrain from harmful acts." *Principles of Biomedical*

*Ethics* at 202–203. While non-maleficence does not preclude physicians from

inflicting *any* harm, physicians must seek to *minimize* patients' exposure to risk of

injury and to justify that risk by the potential for benefit. *See Principles of*

*Biomedical Ethics* at 154 ("Obligations of nonmaleficence include not only

obligations not to inflict harms, but also obligations not to impose *risks* of harm."

(emphasis in original)). This ethical obligation extends even further when paired

with the principle of beneficence, which requires healthcare professionals to "not

merely avoid[] harm" but to proactively "attend[] to the welfare of patients." *Id.* at

202.

The Challenged Laws improperly interfere with a physician's ability to make

decisions based on the individual patient and her best interests. *See* L. Snyder,

American College of Physicians Ethical Manual, 156 (Pt. 2) Ann. Intern. Med. 73,

74-75 (6th ed. 2012) ("The physician's primary commitment must always be to the

patient's welfare and best interests. . . ."); *AMA Code* § 1.1.3(b) ("The practice of

medicine, and its embodiment in the clinical encounter between a patient and a

physician, is fundamentally a moral activity that arises from the imperative to care

for patients and to *alleviate suffering*.") (emphasis added). Specifically, by imposing

a monolithic view of fetal tissue that patients do not share, the Challenged Laws may

needlessly cause psychological and emotional damage to patients, without any

14

countervailing medical benefit, by increasing the stigma, shame, grief, and distress

that can be associated with miscarriage and abortion.  *See, e.g.*, Kari White, Victoria

deMartelly, Daniel Grossman & Janet Turan, *Experiences Accessing Abortion Care*

*in Alabama Among Women Traveling for Services*, 26(3) Women's Health Issues

298, 300-2 (2016) (finding that laws imposing restrictions on abortion facilities may

contribute to the "exceptionality" of abortion and perpetuate notions of abortion

being "morally wrong"); Jonah Bardos, Daniel Hercz, Jenna Friedenthal, Stacey A.

Missmer & Zev Williams, *A National Survey on Public Perceptions of Miscarriage*,

125 (6) Obstetrics and Gynecology, 1313–1320 (finding that a significant number of

women experienced feelings of shame and guilt after miscarriage).  Legislative

actions reflecting certain viewpoints may create, reinforce, or perpetuate stigma,

which can have significant negative health impacts on individuals in a variety of

ways, including reducing available economic and social resources, creating social

isolation, and heightening psychological stress caused by an understanding that they

have an undesirable trait or choice and fear any resulting judgment.  *See* Mark L.

Hatzenbuehler, Jo C. Phelan, & Bruce G. Link, *Stigma as a Fundamental Cause of*

*Population Health Inequalities*, 103(5) Am. J. of Pub. Health 813, 813 (2013).

Women may disagree with the requirements of the Challenged Laws, and as a result,

may experience more shame and stigma associated with seeking and obtaining an

abortion.  *See, e.g.*, Alison Norris, Danielle Bessette, Julia R. Steinberg, Julia R.

Kavanaugh, Megan L. De Zordo Silvia, Davida Becker, *Abortion Stigma:  A*

*Reconceptualization of Constituents, Causes, and Consequences*, Women's Health

Issues, 21(3): s49-s54 (2011) (finding that abortion stigma is heightened by

legislative initiatives imposing certain cultural values).  Indeed, the district court

found that the evidence demonstrates that "when a woman disagrees with how her

embryonic and fetal tissue remains will be disposed, she experiences a greater

amount of grief, stigma, shame, and distress."  ROA.3316.  Stigma also has physical

health implications.  For example, sexual minorities residing in communities

associated with negative viewpoints of sexual minorities, and thus high levels of

stigma, have been found to have worse overall health outcomes than those in more

accepting communities with lower levels of stigma.  *See* Franciso Perales & Abram

Todd, *Structural Stigma and the Health and Wellbeing of Australian LGB*

*Populations:  Exploiting Geographic Variation in the Results of the 2017 Same-Sex*

*Marriage Plebiscite*, 208 Soc. Sci. & Med. 190, 197 (2018).  The threat and

likelihood of negative health impacts on certain patients resulting from their

disagreement with how fetal tissue remains should be disposed exists for women

seeking abortions and women who experience miscarriages alike.

### 4.  The Challenged Laws Unjustly Threaten to Impose on Patients Unnecessary and Undue Burdens.

The cannon of justice in biomedical ethics recognizes the formal principle that

"equals must be treated equally."  *See Principles of Biomedical Ethics* 250–51.

Physicians have an "ethical responsibility to ensure that all persons have access to

needed care regardless of their economic means." *Code of Medical Ethics Opinion 11.1.4*, American Medical Association. This responsibility extends to a woman's reproductive health. *See* Ruth Macklin, *Ethics and Reproductive Health: A Principled Approach*, World Health Statistic Quarterly 151–52 (1996), *available at* http://apps.who.int/iris/bitstream/10665/54277/1/whsq_49_1996_p148-153_eng.pdf (hereinafter Macklin) ("The principle of justice mandates that all individuals who need family planning and health services should have equal access to them."). A distribution of reproductive health services rooted in this principle "requires that methods be accessible to poor women as well as those who are better off, to the less educated as well as those who are better educated, to rural as well as urban residents." *Id.* at 152.

The Challenged Laws would impose economic hardship on all healthcare providers treating pregnant women. ROA.3294. The district court explained that "reliable and viable options for disposing of embryonic and fetal tissue remains in compliance with the challenged laws *do not exist*," ROA.3307 (emphasis added), and the Challenged Laws "deprive healthcare providers, especially those offering abortion care, of a reliable and viable system for disposing of their embryonic and fetal tissue remains." ROA.3313. Considering that "[w]ithout a workable disposal system, healthcare providers cannot offer surgical care for miscarriages or abortions," *id.*, inevitably an entirely new way of disposing EFTR must be developed for all Texan women to continue receiving surgical care for miscarriages or

abortions.  As the district court concluded, clinics unable to develop such disposal methods may shut down entirely, "further constrain[ing] access to abortion." R.3313-14.  To the extent that the Challenged Laws cause clinic shut down, it is likely that rural and low-income patients would be disproportionately burdened.

Further, the district court explained that "the challenged laws do not govern the disposal of embryonic and fetal tissue remains outside of a healthcare facility." ROA.3318.  As such, due to the additional burdens associated with the Challenged Laws, women may instead "avoid obtaining or be unable to obtain pregnancy-related medical care from a healthcare facility, particularly in more rural and remote areas where there are fewer healthcare options."  The district court observed the dangerous implication:  "[w]omen without access to abortion care or who do not believe embryonic and fetal tissue remains should be afforded special status from the moment of conception might well seek an abortion outside of healthcare facilities and the doctor-patient relationship."  *Id.*  The Challenged Laws thus have the effect, as the district court concluded, of limiting access to abortion procedures and miscarriage care in healthcare facilities more broadly, especially in remote and rural areas.  *Id.*  Hampering the ability of women who live in remote or rural areas to seek appropriate healthcare is directly counter to the bioethical medical principle of justice that clearly calls for a "just distribution of reproductive health services" and requires that "methods be accessible to poor women as well as those who are better off, to the

less educated as well as those who are better educated, ***to rural as well as urban***

***residents***." *See* Macklin, at 152.

The Challenged Laws thus impose significant burdens, unjustly preventing

women from seeking certain methods of abortion care and EFTR disposition,

undermining the physician's duty to ensure that all those who require certain

methods of care are able to receive such care.  From a biomedical ethics perspective,

this is yet another instance in which the Challenged Laws' provisions are deeply

troubling.

## IV.    CONCLUSION

The Challenged Laws require physicians to violate ethical principles of patient

care, including the bedrock obligations to provide individualized and appropriate

care to each patient; respect a patient's healthcare choices, including their choices

with respect to human dignity; do no harm; and provide equal access to care

irrespective of financial means.  As such, the Challenged Laws are deeply troubling

to *amici*, who join Appellees in urging the Court to affirm the district court's

decision.

Dated: January 15, 2019

Respectfully submitted,

O'MELVENY & MYERS LLP

/s/ Stuart Sarnoff

Stuart Sarnoff
Nate Asher
Samantha E. Miller
Marjorie B. Truwit
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Kendall  Collins
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Counsel for Amici Curiae Biomedical
Ethicists*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for

the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF

system. I further certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.


/s/ Stuart Sarnoff
Stuart Sarnoff

*Counsel for Amici Curiae Biomedical Ethicists*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,448 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

/s/ Stuart Sarnoff
Stuart Sarnoff

*Counsel for Amici Curiae Biomedical Ethicists*

# APPENDIX

## *AMICI CURIAE*[4]

Dr. Lisa Anderson-Shaw, Dr.P.H., M.A., M.S.N., A.N.P.-B.C.
*Director, UIH Clinical Ethics Consult Service*
*Assistant Clinical Professor, UIC College of Medicine University of Illinois*
*Health System*

Professor Leo Beletsky, J.D., M.P.H.
*Associate Professor of Law and Health Sciences*
*School of Law & Bouvé College of Health Sciences, Northeastern University*

Dr. Amy E. Caruso Brown, M.D., M.Sc., M.S.C.S.
*Assistant Professor of Pediatrics, Bioethics and Humanities*
*Center for Bioethics and Humanities*
*Department of Pediatrics, Division of Pediatric Hematology/Oncology*
*SUNY Upstate Medical University*

Dr. Mara Buchbinder, Ph.D.
*Associate Professor*
*Department of Social Medicine*
*University of North Carolina at Chapel Hill*

Dr. Alyssa M. Burgart, M.D., M.A., F.A.A.P.
*Clinical Assistant Professor*
*Department of Anesthesiology, Perioperative & Pain Medicine*
*Stanford Center for Biomedical Ethics*
*Stanford University*

Dr. Arthur Caplan
*Drs. William F. and Virginia Connolly Mitty Professor of Bioethics, Department*
*of Population Health*
*NYU School of Medicine*

Professor Brietta Clark
*Professor of Law*
*Loyola Law School, Los Angeles*

---

[4] Institutional affiliations provided for identification purposes only.  The views expressed in this brief do not necessarily reflect the views of amici's institutions.

Professor Carl H. Coleman
   *Professor of Law,*
   *Seton Hall University School of Law*

Professor Mary Coombs
   *Professor of Law Emerita*
   *University of Miami School of Law*

Dr. Colleen Denny, M.D.
   *Assistant Clinical Professor*
   *Department of Obstetrics and Gynecology*
   *NYU School of Medicine*
   *Bellevue Hospital*

Dr. Ezekiel J. Emanuel, M.D., Ph.D.
   *Vice Provost of Global Initiatives*
   *Chair, Department of Medical Ethics and Health Policy*
   *Levy University Professor*
   *Perelman School of Medicine and The Wharton School*
   *University of Pennsylvania*

Dr. Eric A. Feldman, J.D.., Ph.D.
   *Deputy Dean for International Programs*
   *Professor of Law*
   *Professor of Medical Ethics & Health Policy*
   *University of Pennsylvania Law School*

Professor Robert I. Field
   *Professor of Law, Kline School of Law*
   *Professor of Health Management and Policy, Dornsife School of Public Health*
   *Drexel University*

Professor Moti Gorin
   *Assistant Professor of Philosophy and Director,*
   *Jann Benson Ethics Center*
   *Colorado State University*

Dr. Scott D. Halpern, M.D., Ph.D.
   *Professor of Medicine, Epidemiology, and Medical Ethics & Health Policy*
   *University of Pennsylvania Perelman School of Medicine*

Professor Laura Hermer, J.D., L.L.M.
    *Professor of Law*
    *Mitchell Hamline School of Law*

Dr. Sharona Hoffman, J.D., L.L.M., S.J.D.
    *Edgar A. Hahn Professor of Jurisprudence*
    *Professor of Bioethics*
    *Co-Director, Law-Medicine Center*
    *Case Western Reserve University School of Law*

Professor Peter D. Jacobson, J.D., M.P.H.
    *Professor Emeritus of Health Law and Policy*
    *Director, Center for Law, Ethics, and Health*
    *University of Michigan School of Public Health*

Dr. Steven Joffe, M.D., M.P.H.
    *Emanuel and Robert Hart Professor*
    *Chief, Division of Medical Ethics*
    *Department of Medical Ethics and Health Policy*
    *University of Pennsylvania Perelman School of Medicine*

Dr. Nancy E. Kass, Sc.D.
    *Vice Provost for Graduate and Professional Education*
    *Johns Hopkins University*
    *Phoebe R. Berman Professor of Bioethics and Public Health*
    *Johns Hopkins Berman Institute of Bioethics and*
    *Johns Hopkins Bloomberg School of Public Health*

Professor Lisa Kearns, M.S., M.A.
    *Senior Research Associate*
    *Division of Medical Ethics*
    *NYU School of Medicine*

Dr. Emily A. Largent, J.D., Ph.D., R.N.
    *Assistant Professor of Medical Ethics and Health Policy*
    *Department of Medical Ethics and Health Policy*
    *Perelman School of Medicine, University of Pennsylvania*

Dr. David Magnus, Ph.D.
  *Thomas A. Raffin Professor of Medicine and Biomedical Ethics*
  *Professor of Pediatrics, Medicine and by Courtesy of Bioengineering*
  *Director, Center for Biomedical Ethics*
  *Stanford University*

Dr. Mary Faith Marshall, Ph.D.
  *Emily Davie and Joseph S. Kornfeld Professor and*
  *Director, Center for Biomedical Ethics and Humanities*
  *School of Medicine*
  *University of Virginia*

Dr. Karen J. Maschke, Ph.D.
  *Hastings Center Research Scholar*
  *The Hastings Center*

Professor Thomas Wm. Mayo
  *Professor, SMU/Dedman School of Law*
  *Adjunct Associate Professor, Internal Medicine,*
  *University of Texas - Southwestern Medical Center*

Dr. Maria W. Merritt, Ph.D.
  *Associate Professor, Berman Institute of Bioethics and Bloomberg School of*
  *Public Health*
  *Johns Hopkins University*

Dr. Steven H. Miles M.D.
  *Professor Emeritus, Medicine and Bioethics*
  *University of Minnesota*

Professor Michelle Oberman
  *Katharine and George Alexander Professor of Law*
  *Santa Clara University School of Law*

Dr. David Orentlicher, M.D., J.D.
  *Samuel R. Rosen Professor of Law*
  *Co-director, William S. and Christine S. Hall Center for Law and Health*
  *Indiana University Robert H. McKinney School of Law*

Dr. Govind Persad, J.D., Ph.D.
  *Assistant Professor*
  *University of Denver Sturm College of Law*

Dr. Reed E. Pyeritz, M.D., Ph.D.
*William Smilow Professor of Medicine and Professor of Genetics*
*Perelman School of Medicine at the University of Pennsylvania*

Professor Jessica L. Roberts
*Alumnae College Professor in Law*
*University of Houston Law Center*

Dr. Lainie Friedman Ross, M.D., Ph.D.
*Carolyn and Matthew Bucksbaum Professor of Clinical Ethics*
*Professor, Departments of Pediatrics, Medicine, and Surgery*
*Co-Director, Institute for Translational Medicine*
*Associate Director, MacLean Center for Clinical Medical Ethics*
*University of Chicago*

Dr. William M. Sage, M.D., J.D.
*James R. Dougherty Chair for Faculty Excellence, School of Law*
*Professor of Surgery and Perioperative Care, Dell Medical School*
*The University of Texas at Austin*

Dr. Bethany Spielman, Ph.D, J.D.
*Professor, Medical Humanities and Law*
*School of Medicine*
*Southern Illinois University*

Dr. Jeffrey P. Spike, Ph.D.
*Affiliate Faculty,*
*University of Virginia School of Medicine Center for Biomedical Ethics and*
*Humanities*
*Clinical Instructor, GW School of Medicine Department of Psychiatry and*
*Behavioral Sciences*

Dr. Ronit Y. Stahl, Ph.D., M.A.
*Assistant Professor of History*
*University of California, Berkeley*

Professor Lance Tibbles
*Professor of Law*
*Capital University Law School*

Dr. Tom Tomlinson, Ph.D.
  *Professor*
  *Center for Ethics and Humanities in the Life Sciences*
  *Michigan State University*

Dr. Robert D. Truog, M.D., M.A.
  *Director, Center for Bioethics*
  *Frances Glessner Lee Professor of Medical Ethics, Anaesthesia, & Pediatrics*
  *Harvard Medical School, Boston, MA*

Professor Ellen Waldman, J.D., L.L.M.
  *Professor of Law*
  *Thomas Jefferson School of Law*